Plaintiffs, the Sugar Creek Syndicate, Incorporated, the Standard Oil Company of Louisiana and the Union Producing Company, are the owners of an oil, gas and mineral lease affecting 445 acres of land in Claiborne Parish, Louisiana; and on the leased premises there is located a producing gas well.
A dispute having arisen regarding the distribution of a portion of the royalties payable under the terms of the lease, plaintiffs instituted this interpleader proceeding, pursuant to the authority granted by Act 123 of 1922, deposited accrued royalties amounting to $439.97 in the Registry of the Court, and cited the several claimants to appear and to have their respective rights judicially determined.
The pertinent facts out of which the litigation arises are as follows: William T. Hightower, on February 26, 1925, sold and conveyed unto Allen P. Findling one-fourth of all of the oil, gas and other minerals on, in and under 160 acres of land in Claiborne Parish described as West Half of Southeast Quarter (W 1/2 of SE 1/4) and East Half of Southwest Quarter (E 1/2 of SW 1/4) of Section 30, Township 20 North, Range 5 West. A few years later, Findling sold to Max Maritzky, Ben Sadovnick and R.E. Bratton three-fourths of his interest, resulting in the owning by each of these parties of a one-sixteenth mineral interest in said tract.
William T. Hightower died in 1927, leaving as his heirs at law Wilbur C. Hightower, Sallie Will Hightower, Mrs. Gladys H. Martin, Mrs. Lucille H. Millikin, Mrs. Marguerite H. Rich, Alton Lane Hightower and Tom Bryant Hightower. These persons, who are hereinafter referred to as the Hightowers, were judicially recognized and sent and put into possession of all property left by decedent, including the described 160 acres.
On August 25, 1933, one F.F. Meadows acquired the above-mentioned 445 acre oil, gas and mineral lease. Affected by it are the 160 acres owned in fee by the Hightowers and 285 acres in which they have *Page 473 
no interest. The contract is known as a unitized lease, this being because of the fact that the property is leased under what is called a pooling arrangement. By mesne assignments it came into the ownership of these plaintiffs.
The Hightowers, on April 13, 1938, instituted a suit in the District Court of Claiborne Parish against Max Maritzky, Ben Sadonvick, R.E. Bratton and the heirs of decedent Allen P. Findling, to whom reference is hereinafter made as Maritzky et al., for the purpose of having judicially declared forfeited, by the prescription of ten years' liberandi causa, the rights of those persons that were acquired under the mineral deed of date February 26, 1925, from William T. Hightower to Allen P. Findling. Under a final decree of the Supreme Court, which considered that cause on appeal, the plea of prescription of the Hightowers was sustained and their property was decreed to be free from the mineral servitude claimed by Maritzky et al. Hightower et al. v. Maritzky et al., 194 La. 998, 195 So. 518.
Following the Supreme Court's decision, and notwithstanding it, Maritzky et al. notified the plaintiffs in the instant cause that they were entitled to be paid royalties under the terms and provisions of the 445 acre lease contract, to which they were originally parties and in which they were designated as lessors. The Hightowers on the other hand were equally insistent that those royalties belonged to them. It was this dispute, involving the mentioned two groups of claimants, that caused the initiating of this interpleader proceeding.
Answers on behalf of the respective claimants were filed, after which a trial was held; and there was judgment recognizing the Hightowers to be the owners of and entitled to receive the royalties deposited. It further decreed that Maritzky et al. had no interest therein and that their demands be rejected. Costs of the proceeding were ordered to be paid and deducted from the mass.
Only Max Maritzky has perfected an appeal from the judgment. The Hightowers have filed an answer thereto asking an amendment of the judgment to the extent of sustaining their originally filed plea of res adjudicata and of casting Maritzky et al. for all costs of the proceeding.
The position assumed by Maritzky et al., as shown by the brief of appellant's counsel, is: "* * * that notwithstanding the loss of their rights of servitude they still are entitled by virtue of the terms of the lease contract of August 25, 1933, to participate in the royalties provided for therein, urging that the validity of the lease contract and the binding effect thereof on all parties who concurred therein was not drawn into question in the case of Hightower v. Maritzky and that so long as the lease contract remains in force they are entitled under the terms thereof to receive royalty or rent. In other words, they urge in effect that the effect of the decision in the case of Hightower v. Maritzky was not to dissolve the lease contract or their rights thereunder; that their right to royalties depended upon the contract and not the life and use of the servitude and that the question of whether their servitude has been used, is presently in force, or has become extinguished by prescription is not a material issue so far as their right to participate in the royalties provided for in the lease is concerned."
The Hightowers contend, to quote from the brief of their counsel, that "they are entitled to be paid these royalties for the reason that, according to their interpretation of the contract, the royalty provided in the lease is to be paid to those owning mineral acreage in the leased premises in the proportion of their ownership at the time the royalties accrued, and that their ownership at the time of the execution of the lease is immaterial."
The controversy, as we appreciate the primary issue, requires an interpretation of the lease contract with reference to the proper persons to whom the stipulated royalties are payable. Either the original lessors are always entitled to receive them, regardless of a change in ownership of the land and minerals; or, the royalties must be paid only to those owning mineral rights in and under the leased lands at the time the royalties accrue, the payments to be in the proportion that their respective interests bear to the entire community tract.
It is our opinion, and this accords with the trial court's holding, that the recited second alternative reflects the intention of the parties to the agreement.
The following provisions are contained in the contract:
"11. If said Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties and rentals herein provided *Page 474 
shall be paid the Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.
* * * * *
"17. (a) It is agreed and understood that the premises leased herein shall, for the purpose of this lease, be considered and treated as owned in indivision by the Lessors and shall be developed and operated as one lease, and all rentals and royalties accruing hereunder shall be treated as an entirety and shall be divided among and paid to Lessors, in the proportion that the acreage (mineral rights) owned by each bears to the entire leased acreage.
"(b). It is further agreed by the Lessors that the premises leased herein are now owned by Lessors as follows: (here are listed the interests owned by the various parties to the lease).
"18. If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is hereby expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns, but no change in the ownership of the land or assignment of rentals or royalties shall be binding on the Lessee until after the Lessee has been furnished with a written transfer or assignment, or true copy thereof; * * *.
"19. The failure or refusal of any party herein named as one of the Lessors or of any other party owning an interest in the lands above described to execute this agreement or the failure of title to any portion of said lands, whether by foreclosure or otherwise, shall in no manner affect the validity or effectiveness of such agreement, which shall cover and apply to the tract or tracts of land hereinabove described in so far as and to the extent that such tract or tracts are owned from time to time by the parties so executing, their heirs, successors and assigns; and in case of any such failure or refusal to execute or failure of title, the rentals and royalties payable hereunder shall be adjusted accordingly."
The quoted provisions, when considered together, convincingly and conclusively show, we think, that the receiving of royalties under the lease is dependent and contingent on a mineral interest ownership by the recipient at the time of their accrual. Almost all of them would be of no significance or importance if appellant's contention were tenable.
It is true that the names of Maritzky et al. are contained in the instrument, as appellant's counsel point out, among those of the many lessors, they being found in Section 17 (b). But preceding their listing is the statement that "* * * the premises leased herein are now owned by Lessors as follows * * *." This declaration, together with the listing, has for its purpose only the showing of ownership of the various mineral interests at the time of the lease's confection. It is in no manner restrictive of the general provisions of subsection (a) of Section 17 which stipulate for the division or payment of accruing rentals and royalties on a mineral acreage ownership basis and proportionate to the entire leased acreage.
Section 11 above quoted also speaks of payment according to the interest of a lessor. Reference to changes in ownership of lands and mineral interests is made in Section 18. And in Section 19, an adjustment in the payment of rentals and royalties is provided for in the event of the happening of certain contingencies, one of which is the failure of title of a named lessor.
If it be assumed, for the purpose of argument, that the mineral servitude acquired by Maritzky had not prescribed but that he had sold and assigned it to another, with proper notice of the sale and assignment being given to the lessees, could it be correctly said that merely by reason of his being an original lessor under the lease he, after the sale, was still entitled to be paid rentals and royalties. Obviously the answer is no. The prescription of ten years, held as above shown to have accrued, provided a termination of Maritzky's interest just as a sale thereof would have done; and his rights under the lease have likewise expired.
The several recent cases of our Supreme Court that are cited by appellant in aid of his contention, the opinions of which have been carefully read by us, are clearly inapplicable. The factual situations therein involved were entirely dissimilar to the one presented in the instant controversy.
Our above-announced holding makes unnecessary a consideration of the plea of res adjudicata.
We shall not disturb the decree, as counsel for the Hightowers request, ordering that the costs of the trial court in this proceeding shall "be deducted from *Page 475 
the mass." The interpleader act, which authorizes the procedure resorted to herein, makes no provision for the payment of costs as between claimants to a deposited fund. It seems to be customary, however, in cases of this kind for them to be cared for out of such funds.
Furthermore, of those litigants known as Max Maritzky et al., only Max Maritzky appealed. And the Hightowers did not appeal; consequently, as between them and the non-appealing members of the Max Maritzky et al. group, all of whom are non-residents of Louisiana and are represented by a curator ad hoc, the judgment cannot be amended.
But these absentees, through their curator ad hoc, did engage in the contest in the trial court, as did Max Maritzky whose demand was for a sum much smaller than their combined claims; and it would seem inequitable to condemn him to pay the entire costs. Then, too, a part thereof proportionate to his claim would be rather insignificant.
Act 229 of 1910 authorizes an appellate court to tax costs as in its judgment may be deemed equitable. This authority justifies our giving approval to the method employed by the district court.
The judgment appealed from is, therefore, affirmed. The costs of this appeal shall be paid by appellant Max Maritzky.