178 So.2d 508 (1965)
Lucille UZEE, Plaintiff-Appellant,
v.
Donald BOLLINGER, Defendant-Appellee.
No. 6428.
Court of Appeal of Louisiana, First Circuit.
July 1, 1965.
Rehearing Denied September 27, 1965.
*509 R. Gordon Kean, Jr., of Sanders, Miller, Downing, Rubin & Kean, Baton Rouge, Guzzetta & LeBlanc, Thibodaux, F. D. V. de La Barre, New Orleans, for appellant.
Victor A. Sachse, of Breazeale, Sachse & Wilson, Paul M. Hebert, Baton Rouge, John X. Allemand, Thibodaux, Moise S. Steeg, Jr., of Steeg & Shushan, New Orleans, for appellee.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
ELLIS, Judge.
By deed dated August 13, 1945 Miss Lucille Uzee sold a tract containing eighty (80) arpents of land to Mr. Donald Bollinger. The deed contains the following language:
"It is well understood and agreed between the parties hereto that the vendress, Miss Lucille Uzee, reserves from this sale one-fourth (1/4) of all oil, gas, sulphur and other minerals on, in and under the property hereinabove described and presently conveyed.
"It is further agreed and understood between the parties that the vendee herein, Donald Bollinger, is granted the exclusive right to lease the aforedescribed property for oil, gas, sulphur and other minerals and to receive therefrom the whole of the rental or bonus money from said lease."
On December 30, 1964, defendant granted a mineral lease which provided for a 1/8 base royalty. This lease ultimately became the property of The Texas Company who drilled a single but productive well. Defendant thereafter became dissatisfied and successfully prosecuted a suit to have that lease canceled. Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132.
On April 21, 1954, just prior to the institution of that suit, defendant granted a top lease providing for a 1/8 base royalty to Mr. Louis J. Roussel and entered into a collateral agreement with him, wherein Mr. Roussel agreed to pay defendant $3,500.00; to pay all costs in connection with the suit against The Texas Company; to hold defendant harmless "* * * from any such expenses, as well as any losses, damages or suits which may directly result from the execution of this agreement or the execution of the * * * lease * * *"; and to make certain loans to defendant during the pendency of the suit against The Texas Company. The agreement required Mr. Roussel to execute an overriding royalty interest in favor of defendant equivalent to 1/16 of all minerals produced. The agreement specified that the overriding royalty interest "* * * is not to be reduced or otherwise divided because of the ownership by any other person * * * of royalties or minerals in the said tract * * *". Also in that agreement Mr. Roussel bound himself to grant a production payment to defendant of $25,000.00 payable out of 1/16 of 7/8 of the minerals produced, and a second *510 similar production payment of $10,000.00 to defendant's attorneys. Other portions of the collateral agreement are not important here.
On June 28, 1957, following the successful conclusion of Bollinger v. Texas Company, supra, defendant executed an amendment to the top lease in favor of Mr. Roussel to show that in executing the original top lease defendant had acted individually and as the agent and attorney in fact for Miss Uzee.
Payments to the defendant under the collateral agreement were made, as were payments to plaintiff of 1/4 of 1/8 of the minerals produced.
Dissatisfaction with Mr. Roussel and his assignee, Republic Petroleum Corporation, developed and on January 29, 1960, defendant filed suit to cancel the lease granted to Mr. Roussel on April 21, 1954. The pleadings in that suit fully disclosed all of the facts regarding the top lease and collateral agreement and plaintiff was made a defendant in that suit as she had been in the suit against The Texas Company. After trial, but before the rendition of judgment, the Bollinger v. Roussel suit was compromised, and, in consideration, defendant received an additional 1/16 overriding royalty interest and a $45,000.00 production payment, payable out of 1/16 of the net working interest of Republic Petroleum Corporation.
The instant litigation was begun in March 1963 by Miss Uzee who is the usufructuary of the reservation contained in the original 1945 deed to Bollinger. The lower court rendered judgment dismissing plaintiff's demands and she, along with Mr. Clarence Arcement, who is her friend and agent and the owner of the naked interest in the mineral reservation, has appealed. Miss Uzee is attempting to have her reservation recognized as a mineral interest and to force Mr. Bollinger to account for 1/4 of the two production payments and for 1/4 of the two overriding royalties granted him in the collateral agreement and in the compromise.
Mr. Louis J. Rousell was made a third party defendant by Mr. Bollinger under the above "hold harmless" agreement.
Plaintiff contends that defendant was her agent and had the duty of utmost fair dealing in connection with the leasing of what plaintiff claims is her mineral servitude. Claiming that this standard was not met, plaintiff seeks an interest in both the production payments and overriding royalties. In the alternative, plaintiff claims that, at a minimum, she is entitled to one-fourth of the two overriding royalties as these could have been and should have been secured by defendant in the form of additional interests in production.
Plaintiff has relied on Horn v. Skelly Oil Co., 224 La. 709, 70 So.2d 657, and Namie v. Namie, La.App., 134 So.2d 572, as creating a fiduciary relationship between a landowner holding executive rights and a mineral servitude owner.
In the Horn case the Supreme Court characterized the reservation in question as a mineral servitude and the grant of the privilege of leasing that interest as a mandate coupled with an interest. However, only the nature of the reservation was important in that case, there being no claim that a fiduciary duty was created. Nor does the Namie case establish the fiduciary relationship or impose a duty of utmost fair dealing on the holder of the executive right. In that case, Nomie Namie sold land to his brother, Joe, reserving a mineral interest, including half of all bonus and rental. Within the ten year period Joe granted a lease which provided that the $4,000.00 bonus be placed in escrow pending title examination. The court followed the doctrine of Mulhern v. Hayne, 171 La. 1003, 132 So. 659, that a joint lease with a primary term running past the expiration date of an outstanding interest keeps the interest alive during the lease period. The question in the case was one relating to prescription.
*511 In order for the plaintiff to establish a fiduciary relationship between herself and the defendant and thereby successfully maintain this action for an accounting, it is necessary that the relationship of principal and agent exist. The lower court found that the law of this state as applied to the facts before the court did not support such a relationship and with this we concur. There are a number of cases which reject the doctrine of agency with reference to the person having the right to lease land.
In the case of Hightower v. Maritzky, 194 La. 998, 195 So. 518, the defendants contended that, by a similar reservation, the plaintiff had been appointed agent for the defendant and that, therefore, prescription was inapplicable to the case as it could not run in favor of an agent against the principal. In rejecting that argument the court said at page 520:
"It has been decided that such stipulations in a sale or reservation of the mineral rights in a tract of land do not constitute a mandate or power of attorney. Mt. Forest Fur Farms of America v. Cockrell, 179 La. 795, 155 So. 228 * * * By the stipulations referred to, in the deed from Hightower to Findling, Findling merely consented that Hightower, being the owner of the land and having the right to three-fourths of whatever oil or gas might be produced from it, should have the exclusive right to grant mineral leases on the land and to collect any rental or bonus that might be due under the lease. But any lease that might have been granted by Hightower would have been granted not as agent for Findling but as owner of the land, notwithstanding it would have inured to the benefit of Findling, to the extent of his interest in the royalties, as an incident of his having the one-fourth mineral right in the land."
In the case of Mt. Forest Fur Farms of America v. Cockrell, 179 La. 795, 155 So. 228, plaintiff landowner sought an accounting from defendant lessor. The court found that defendant had reserved the right to lease and that this was not a right to lease as agent for the landowner.
In both the Hightower and Mt. Forest cases the person owning the right to lease the land was other than the landowner. In the case at bar the landowner was specifically granted that right to lease and became the owner thereof. The case of Nolen v. Bennett, La.App., 119 So.2d 636, relied on the Hightower and Mt. Forest cases but involves the reverse, that is, the right to lease being vested in the landowner. We believe this case is on all fours factually and the holding particularly applicable to the case under consideration. The facts in the Bennett case are stated as follows:
"For the purpose of clarity the following facts are set forth in chronological order:
"W. H. Bennett, by cash deed dated March 12, 1937, conveyed to J. S. Nolen the ownership in fee of the above described property, the instrument containing the following reservation.
"`The vendor, W. H. Bennett, reserves from this sale one-half (1/2) of all the oil, gas and other minerals in and under or that may be produced from the above described tract of land but especially grants to the vendee J. S. Nolen the right and privilege of executing oil and gas mineral leases covering the above described lands without the signature of W. H. Bennett, his heirs, successors or assigns; it being further agreed and stipulated that J. S. Nolen shall retain all of the bonus consideration paid for the execution of said oil and gas mineral leases and the said J. S. Nolen shall receive and have for himself all of the rentals which may be paid to keep in force and effect such oil and gas mineral leases as may be executed covering the above described tract of land.

*512 "`The said W. H. Bennett binds and obligates himself, if requested, to ratify such oil and gas mineral leases as may be executed by said J. S. Nolen, his heirs, successors, or assigns.'
"On October 13, 1942, W. H. Bennett executed a mineral sale to J. Aubin Bennett conveying vendor's reserved one-half of all the oil, gas and other minerals in or under the subject property.
"On January 15, 1943, J. S. Nolen executed an oil, gas and mineral lease covering the subject property in favor of Roy Lee, Trustee, who was then Trustee of Hassie Hunt Trust, said lease being for a primary term of ten years.
"In November 10, 1945, the Department of Conservation issued Order No. 9-C providing rules and regulations for production from some of the sands found in the Northeast Lisbon Field and the Lisbon Field of Louisiana. (An inspection of this order shows that it has no application to any land situated in Section 35, Township 22 North, Range 4 West.)
* * * * * *
"The appellant herein defends upon two grounds: (1) that in the execution of the mineral lease granted in favor of Roy Lee, Trustee, J. S. Nolen acted as the agent of W. H. Bennett and such lease was a joint lease in contemplation of law, the effect of which was to interrupt prescription; and (2) Order No. 9-C of the Conservation Department had the effect of suspending the running of prescription against the mineral reservation by W. H. Bennett."
The court held it was not a joint lease and also:
"The jurisprudence is crystal clear that the provisions of the act of sale from Bennett to Nolen did not in any wise constitute Nolen the agent of W. H. Bennett and his successor in title in connection with the leasing of the land."
We are in complete accord with the concurring opinion which states:
"Though I am in accord with all the findings of fact and the conclusions of law set forth in the opinion of this court, I feel that the elaborate discussion of the issues involving the questions of execution of a joint lease and agency are superfluous. Reference to the reservation clause of the conveyance from Bennett to Nolen discloses that it has no application to any possible benefits arising from mineral development except as to a royalty interest in minerals, when and if produced.
"In other words, it is my position that Bennett sold with the land all rights and benefits related to the leasing privilege and, therefore, the questions as to joint leasing and agency are completely immaterial and irrelevant."
In the case at bar, Miss Uzee (plaintiff-appellant) sold "with the land all rights and benefits related to the leasing privilege" and therefore reference to the reservation clause of the conveyance "has no application to any possible benefits arising from mineral development except as to a royalty interest in minerals, when and if produced."
Miss Uzee conveyed the land, the right to lease, and the right to any and all bonuses and delayed rentals and her reservation of 1/4 of minerals is nothing more nor less than a royalty interest.
Though not with equal clarity, the cases of Vincent v. Bullock, 192 La. 1, 187 So. 35, and Martel v. A Veeder Co., 199 La. 423, 6 So.2d 335, likewise support defendant's contention that Louisiana has rejected the doctrine of implied agency and fiduciary relationship as between the owner of royalty interest and the owner of the right to lease the land for mineral purposes.
Plaintiff has placed great emphasis on McDonald v. Grande Corp., La.App., 148 *513 So.2d 441. In that case the mineral lessor sued the lessee for cancellation and reached the appellate court on plaintiff's appeal from a summary judgment dismissing the case. The case involved a voluntary pooling clause in a mineral lease, under which the lessee was granted the power to form a unit. This was done by the lessee who later extricated himself, but not the lessor, from it. The court held that:
"Thus, in exercising the broad powers granted to a mineral lessee by a lease, the mineral lessee is under the duty to exercise them in accordance with the fundamental purpose for which they were granted to him by the lessor-landowner, which is to secure the greatest possible ultimate return to the landowner from the mineral development of his land. The mineral lessee must therefore act in connection with the voluntary pooling power with the good faith intention of serving the lessor-landowner's interest or, at the very least, the mineral lessee must not act in connection with such pooling power to the detriment of the lessor-landowner's interest, since in pooling the lessor-landowner's land, the lessee is acting virtually as the former's agent as well as for itself."
That case is inapplicable here as the case before this court does not involve a lessor-lessee relationshipbut rather the relationship between the owner-lessor and the owner of a fractional mineral or royalty interest.
Aside from any consideration of agency, plaintiff contends that there existed a duty on the part of Bollinger to deal fairly and in good faith with the rights of the plaintiff. A breach of this general duty is alleged in defendant's acceptance of substantial bonus for himself rather than his negotiating for and receiving in lieu of bonus, additional base royalty. This argument is untenable for two reasons:
First, Bollinger acted within his powers under the terms of the 1945 deed. At no time did plaintiff receive less than ¼ of the base royalty. It is evidence that the parties in 1945 contemplated that there would be bonus or royalty payments for the exclusive benefit of Bollinger. No limit on the amount of the bonus was stipulated and this court will not arbitrarily supply one.
Second, there was no duty on the part of Bollinger to negotiate for additional base royalty in lieu of bonus. To do so would be to sacrifice his own interest, and a right expressly granted him in the 1945 deed.
The allegations of fraud are unfounded. Both Miss Uzee and Mr. Arcement testified that they did not view Mr. Bollinger's actions as fraudulent. The evidence indicates that Mr. Bollinger considered he was dealing for himself and that the amendment to the lease granted to Mr. Roussel was to satisfy the latter's attorneys and was not, as plaintiff contends, a recognition that plaintiff owned a mineral interest. Miss Uzee knew, as did everyone else in the community, that following The Texas Company suit Mr. Bollinger had received concessions from Mr. Roussel. Mrs. Bollinger herself told Miss Uzee about the compromise of the suit against Roussel. The conclusion is inescapable that Mr. Bollinger was not guilty of any fraud.
The reservation in the 1945 deed was of a royalty interest and the fact remains that defendant was left free, as the owner of the right to lease, to bargain for himself, to obtain whatever bonus cash or added royalty interest from lessee's 7/8 and all delayed rentals. The first overriding royalty and first production payment were granted in consideration of the top lease executed in favor of Mr. Roussel. Under the clear terms of the 1945 reservation Miss Uzee was not entitled to share in these items, they being in the nature of a bonus.
The second production payment and second overriding royalty interest were granted to Mr. Bollinger to compromise a pending lawsuit between himself and Mr. Roussel. *514 Miss Uzee contributed nothing to that litigation. Indeed, she wasn't even on speaking terms with the defendant, a situation having its roots elsewhere than in the facts of this litigation. Her only claim is for one-fourth of one-eighth of the minerals produced, which has been consistently recognized, paid, and accepted.
The alternative demand, that plaintiff is entitled to one-fourth of the two overriding royalty interests, must be rejected. It is grounded on the theory that defendant's duty to plaintiff required that he negotiate for additional royalty in the mineral lease rather than for an overriding royalty interest. No such restriction is imposed by law or by the agreement between the parties. It cannot be inferred and consequently does not exist.
Having rejected plaintiff's claims against the defendant it is unnecessary to consider the "hold harmless" clause of the April 21, 1954, collateral agreement.
Affirmed.